# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

NO. _____

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATE OF NORTH CAROLINA, | ) ) ) | |
| Plaintiffs, | ) ) | |
| V. | ) ) | COMPLAINT |
| A PERFECT FIT FOR YOU, INC., MARGARET A. GIBSON, and SHELLEY P. BANDY, | ) ) ) ) | |
| Defendants. | ) | |

The United States of America, by and through the United States Attorney for the Eastern District of North Carolina, and the State of North Carolina, by and through the North Carolina Attorney General's Office, complain of the Defendants and say:

<u>INTRODUCTION</u>

1. This is a civil action in which the United States and the State of North Carolina are plaintiffs (hereafter jointly as "Plaintiffs" or "the Governments") to recover statutory damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.* (jointly with the federal False Claims Act as "FCAs"), and to recover all available damages for payment under mistake of fact and unjust enrichment. These claims arise out of the knowing submission of false or fraudulent claims to the United States and the State of North Carolina through the Medicaid program for reimbursement of durable medical equipment ("DME") supplies and services that were not provided or were billed in violation of Medicaid policy.

1

<u>JURISDICTION AND VENUE</u>

2. This action arises under the False Claims Act, as amended 31 U.S.C. §§ 3729-3733, the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, and at common law. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1331.

3. Venue is proper in the Eastern District of North Carolina, pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) and 31 U.S.C. §§ 3732(a) and (b). The Defendants can be found, reside, and/or transact/transacted business within this district, and acts proscribed by the False Claims Act and North Carolina False Claims Act occurred within this district.

<u>PARTIES</u>

4. Defendant A PERFECT FIT FOR YOU, INC.'s principle place of business is 2900 Arendell St. Suite 6, Morehead City, North Carolina, Carteret County. A Perfect Fit For You, Inc. ("APF4Y" or "the company") is a Medicare and Medicaid Provider that provides DME products to Medicare and Medicaid recipients in and around Carteret County.

5. Defendant MARGARET A. GIBSON ("Gibson") resides at 120 Rollingwood Drive, Newport, North Carolina. She is the registered agent of APF4Y. Throughout the time relevant to this action, Gibson acted as an owner or co-owner of APF4Y. Gibson managed the administrative matters of the business, verified recipient eligibility (including Medicare and Medicaid), submitted healthcare claims for reimbursement to healthcare payors, managed the finances of the company and paid its vendors, staff and sales personnel. At all times relevant to the allegations of this complaint, Gibson resided in and transacted business within the Eastern District of North Carolina and is subject to the personal jurisdiction of this Court.

6. Defendant SHELLEY P. BANDY ("Bandy") resides at 1503 Dill Creek Lane, Morehead City, North Carolina. Throughout the time relevant to this action, Bandy acted as a sales representative for APF4Y and received wages, commission payments, real property and other

2

items of value from the company. Bandy ordered DME products that APF4Y billed to the Medicaid Program. At all times relevant to the allegations of this complaint, Bandy resided in and transacted business within the Eastern District of North Carolina and is subject to the personal jurisdiction of this Court.

<u>THE MEDICAID PROGRAM</u>

7.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.*, establishes the Medicaid program. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The United States provides monies to a state to partially fund the program and also ensures that the state complies with minimum standards in the administration of the program. The state then pays the difference between the cost of the covered medical service or product and the amount provided by the United States.

8.     Each state must have a single State agency to administer the Medicaid program. 42 U.S.C. § 1396a(a)(5). The North Carolina Department of Medical Assistance ("NCDMA") administers the Medicaid program in North Carolina.

9.     NCDMA utilizes a fiscal agent to manage the Medicaid claims process system, including the Medicaid claims billing and payment processes. NCDMA's fiscal agent is CSRA, which operates NCTracks, the Medicaid Management Information System for the State of North Carolina. NCTracks accepts electronic claim submissions from medical professionals and/or companies that have completed the necessary documentation to become a Medicaid Provider. The electronic claim submissions seek reimbursement for products and/or services already provided.

10.     To become a Medicaid Provider ("Provider"), health care providers execute a Provider Agreement with NCDMA, or their fiscal intermediary, agreeing to bill for medically necessary services that are rendered as billed and to follow the applicable billing policy for

3

submitting claims for payment.

11. NCDMA provides policies, bulletins and other information concerning the types of services/products it will pay for, the manner in which the service/product should be provided and billed, and other requirements pertinent to the type of service/product at issue.

12. Medicaid is a payor of last resort. Providers agree to submit payment for the service and/or product delivered to a Medicaid recipient after it has submitted the claim to the recipient's primary insurance provider.

13. Medicaid Providers bill for services and/or products by electronically submitting a Health Insurance Claim Form ("Medicaid Claim Form"). The Medicaid Claim Form requires the Provider to identify the Medicaid recipient who received the service and/or product, the date the service/product was provided, the type of service/product provided, the person or entity who provided the service/product, any other insurance coverage for the recipient (including Medicare), and the amount paid by other insurance for the service/product billed. In addition to the above information, the Medicaid Program also tracks when a claim was submitted for payment.

14. Medicaid Providers use numeric claim codes specific to the type of service and/or product provided when submitting said claims to the Program for payment. Providers are required to use the most accurate code on their claim submissions to verify that they are billing, and the Program is paying, for the actual service and/or product provided. The Program relies on the Provider to submit the most accurate code for the service and/or product provided and pays the Provider the amount allowed for said service and/or product. The reimbursement amount allowed for each service and/or product is listed on NCDMA's website.

15. As a condition of payment, the Provider furnishes and certifies to certain information on the Medicaid Claim Form, including the identity of the patient, the provider number, the procedure code number, the medical necessity for the service rendered, and that the

4

service was rendered as billed. In submitting electronic Medicaid Claim Forms, Providers must certify that the information included on the form presents an accurate description of the services rendered and/or product delivered.

16. Because it would not be feasible to review medical documentation before paying each claim, NCDMA and/or its fiscal agent generally make payment after Medicaid Claim Forms are submitted with the Provider's certification, without reviewing back-up documentation. However, regulations require the Provider keep such documetation for review by NCDMA or its designee.

17. Medicaid Provider Agreements require Providers to retain documents in support of their claim submissions for six years from the date of service.

18. NCDMA and/or its fiscal agent routinely provide information to Providers regarding which of their claims the Program paid, denied or adjusted. In addition, NCTracks maintains a website wherein Providers may log on using their username and password and access their accounts. Within the NCTracks website, Providers can see which claims have been paid/denied or adjusted along with specific information concerning each claim billed, including the name of the Medicaid recipient who received the service/product, the date said service/product was provided, the type of service/product provided, and whether other insurance paid for any portion of the claim submitted to the Medicaid Program.

## BACKGROUND

19. APF4Y opened on or about October, 2014 and was later approved by NCDMA to be a Medicaid Provider. Gibson, on behalf of APF4Y, signed a Medicaid Provider Agreement wherein APF4Y agreed to follow the applicable Medicaid billing policy for submitting claims for payment to the Medicaid Program. APF4Y was approved by the Medicaid Program to submit DME claims to the Program for reimbursement.

5

20.     The Medicaid policy applicable to DME services/products requires that a physician, physician assistant or nurse practitioner verify that the DME product billed is medically necessary.   Medical necessity must be documented by the prescriber for every item provided/billed and maintained in the patient file.   The patient's medical necessity for DME is often documented on a form titled "Certificate of Medical Necessity", which is completed by the medical professional who prescribes the product.

21.     APF4Y was required to obtain prior approval for all DME products it billed to the Program that required said approval.   Several expensive DME products must be pre-approved by the Medicaid Program before a Provider submits their claim for reimbursement, including Pneumonic Compressors (E0652), Osteogenesis Stimulators (E0748), Knee/Ankle/Foot Orthotics (L2005), Powered Air Flotation Beds (E0193); Cough Stimulating Devices (E0482), and Wheel Chair Accessories/Power Seating Systems (E0193).

22.     Medicaid Providers bill DME products to the Medicaid Program using Healthcare Common Procedure Coding System (HCPCS) codes.     Each product billable is listed in the NCDMA fee schedule, which identifies the product, HCPCS code associated with the product, the amount Medicaid will pay for said product, and which DME products require prior approval from the Program.   For example, the 2014 NCDMA Fee Schedule identifies a reimbursement rate of $4,182.17 for a new Osteogenesis Stimulator (bone-growth stimulator), HCPCS code E0748, and notes that the Osteogenesis Stimulator requires approval from the Medicaid Program prior to billing said product.   This information is on NCDMA's website and readily available to Medicaid Providers.

23.     APF4Y verifies the insurance benefits of the patients that they service, measures the patient for the product if required, orders the product from a third-party vendor, delivers the product, and verifies that it fits appropriately, if required.

6

24. APF4Y must retain the medical necessity documentation for the items ordered, along with the delivery verifications, for at least six years.

25. APF4Y billed claims for various DME products to Medicare and Medicaid for payment.

26. Although APF4Y opened in October, 2014, it did not receive its first Medicaid payment until March, 2015. APF4Y received approximately $20,000 for Medicaid claims it billed in March, 2015; $60,000 for claims it billed in April, 2015; $120,000 for claims it billed in May, 2015; $180,000 for claims it billed in June, 2015; and $200,000 for claims it billed in July, 2015. The Medicaid payments nearly doubled the following month (approximately $350,000) and then skyrocketed in September, 2015. In September, 2015, APF4Y billed (and was paid) over $1,500,000 by the Medicaid Program. These substantial billings continued until June, 2016.

27. Bandy filed an action in Carteret County Superior Court against Gibson on May 16, 2016, asserting partial ownership in APF4Y (Bandy v. A Perfect Fit For You, Inc. (16 CVS 456)). Gibson contends that she is the sole owner of APF4Y. Bandy moved the Carteret County Superior Court to appoint a receiver and for an injunction to prevent Gibson from disposing of company assets. The Superior Court appointed a receiver ("Receiver") to manage the business until the ownership issue resolved, granted the injunction and enjoined the company, Gibson, and Ronald Gibson (Margaret Gibson's husband), from transferring or disposing of assets traceable to the company (except for company assets used by the Receiver in the ordinary course of business), and transferred the case to the North Carolina Business Court. This matter will hereinafter be referred to as the "Business Court Action".

28. The Receiver performed an audit of the company's billings and determined that the company had received over $12,000,000 of Medicaid payments for services/ products in violation of Medicaid policy, namely because the company did not have the requisite paperwork to support

7

the medical necessity or delivery of the DME products it billed. The State intervened in the Business Court Action to seek recoupment of the monies the State paid to APF4Y for product the company inappropriately billed to the Program.

29.     APF4Y admitted in its Answer to the State's Intervention Complaint that APF4Y received "an overpayment [] in excess of $12 million and that those payments are required to be reimbursed to the State of North Carolina." (Business Court Action, ¶ 19).

30.     AP4FY filed cross-claims in the Business Court Action against Gibson and Bandy wherein APF4Y admitted that it never "ordered, purchased, or delivered" any cough stimulators, pneumatic compressors, specialized air mattresses, osteogenesis stimulators, or knee/ankle/foot orthotics. (APF4Y Cross Claims, ¶ 37). The company admitted that it billed the Medicaid Program and was paid for these products (Id. ¶¶ 34, 35), but does not have any of the "required medical or fiscal records in its possession" to support these billings. (Id. ¶¶ 35, 36).

31.     The company's lack of payments, orders and/or delivery documents for cough stimulators, pneumatic compressors, specialized air mattresses, osteogenesis stimulators, or knee/ankle/foot orthotics "would have been evident to anyone who reviewed the Company's financial books and records." (Business Court Action, APF4Y Cross-Claim ¶ 37). APF4Y's financial records did not list payments to "any vendor or third-party entity" for these products. (Id. at ¶ 38).

32.     APF4Y's Medicaid claims for cough stimulators, pneumatic compressors, specialized air mattresses, osteogenesis stimulators, or knee/ankle/foot orthotics were "wholly false and fictitious". (Business Court Action, APF4Y Cross-Claim ¶ 40).

33.     When interviewed, Bandy admitted that APF4Y did not provide osteogenesis stimulators or cough stimulating devices to patients. Gibson admitted that APF4Y did not provide air flotation beds/power pressure reducing air mattresses, cough stimulators, osteogenesis

8

stimulators or knee/ankle/foot orthotics to its patients.

34.     Bandy and Gibson disagree as to who was responsible for the Medicaid billings.

## FRAUD SCHEMES

Billing for Products Not Provided

35.     APF4Y billed for five types of DME products for Medicaid recipients that APF4Y did not provide: Powered Air Flotation Beds (E0193); Bone Growth Stimulators (E0748); Power Wheelchair Accessories (E1008); Custom Knee/Ankle/Foot Orthotics (L2005); and Cough Stimulating Devices (E0482). The Medicaid Program paid APF4Y more than $9,000,000 for these products.

36.     APF4Y falsely claimed that these products were medically necessary and actually provided to Medicaid recipients. These products were neither medically necessary nor delivered to recipients.

37.     APF4Y does not manufacture the items that it provides to its patients. Instead, APF4Y purchases the DME products from a wholesaler or the manufacturer and then distributes them to patients. APF4Y has no records of purchasing Powered Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices from vendors to later distribute to patients.

38.     Gibson managed the company bank account and paid the invoices for medical products purchased by the company. Gibson did not approve any APF4Y payments for Powered Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices.

39.     Examples of false claims submitted for payment for product APF4Y did not provide are as follows:

        a.     On May 23, 2016, Bandy received an email from one of the APF4Y fitters

9

identifying Medicare/Medicaid recipient "R.R."[1] as a new patient. (To protect patient privacy, patients' names are abbreviated in this Complaint). On June 3, 2016, APF4Y submitted claims for a Pneumatic Compressor, Osteogenesis Stimulator, Knee/Ankle/Foot Orthotic, and Powered Air Flotation Bed for dates of service ranging from February 19, 2016 through April 19, 2016, several months before R.R. became an APF4Y patient. These claims were all submitted to the Medicaid Program on the same date. The Medicaid Program paid the company more than $25,000 for these false claims. R.R.'s APF4Y file does not contain any medical necessity documentation in support of his need for these products, nor are there any delivery documents in the file to verify that R.R. received them. Further, the company and its two highest officers/members agree that it did not provide some or all of these products to anyone.

b. On April 7, 2016, Bandy received an email from an APF4Y fitter identifying Medicare/Medicaid recipient "W.W." as a new patient. His measurements were not faxed into the office until April 18, 2016. However, a series of claims were billed to the Medicaid Program on April 8, 2016, one day after W.W. was identified as a new patient but ten days before the company received the measurements necessary to order DME supplies. Further, the company billed the Medicaid Program for an Osteogenesis Stimulator, Knee/Ankle/Foot Orthotic, Cough Stimulating Device, Wheelchair Accessories/Power Seat System, Powered Air Flotation Bed, and a Lightweight Portable Motorized Wheelchair on the same day (April 8, 2016), but listed dates of service on these claims from May, 2015 through September, 2015. Thus, not only did the company bill the Medicaid Program for DME products that it did not deliver to W.W., but APF4Y noted that these products were provided close to a year before W.W. became an APF4Y patient. The Medicaid Program paid APF4Y over $35,000 for these false claims. W.W.'s APF4Y file

[1] Upon request, Plaintiffs will provide full names of the recipients referenced herein to Defendants.

10

does not contain any medical necessity documentation in support of his need for these products, nor are there any delivery documents to verify that W.W. received them.

c.     Medicare/Medicaid recipient "M.C." received mastectomy bras from APF4Y.   Bandy told M.C. that she could receive mastectomy bras, paid for by the Government, even though M.C. does not have cancer.   Medicaid paid over $900 for mastectomy bras and breast prostheses for M.C.   Medicaid also paid over $26,000 for an osteogenesis stimulator, cough stimulating device, knee/ankle/foot orthotic, and power wheelchair.   M.C. did not need these products.   Except for approximately six mastectomy bras, M.C. did not receive any of them either.

d.     Although the company did not open until October, 2014, APF4Y billed the Medicaid Program for product it claimed to have delivered to patients as early as January, 2013. Medicaid did not pay for these claims.

e.     The company billed the Medicaid Program for DME products for dead recipients.   On several occasions, the recipients had been dead for more than a year before APF4Y billed the Medicaid Program for these products.

40.     Some of APF4Y's patients received DME products from APF4Y, although often not the products APF4Y billed to the Medicaid Program.   For example, Medicaid recipient "C.D." required day and night compression garments for her arms.   Compression garments were ordered, for which the company paid approximately $1,200.   The company then billed the Medicaid Program, and was paid, for an Osteogenesis Stimulator, Knee/Ankle/Foot Orthotic, and Cough Stimulating Device.   The company received more than $17,000 for these false claims.     C.D.'s file did not contain the medical necessity documentation to support the products it billed or any verification that C.D. received these products.

Billing Claims for Dually Eligible Recipients Solely to Medicaid

11

41.     Medicaid is the payor of last resort.   Many APF4Y patients are dually eligible for Medicare and Medicaid.   For those patients, APF4Y is required to bill Medicare first.   Generally, the Medicare Program will pay approximately 80% of the claim value and the Medicaid Program will pay the remaining 20%.

42.     APF4Y routinely billed Medicaid, solely, for dually eligible recipients.   APF4Y indicated on these claim submissions that Medicare had been billed for the product but had paid nothing for the claim.   This prompted Medicaid to pay the full value of the claim instead of the smaller portion Medicaid would have normally paid.   As an example, "W.M." is a Medicare/Medicaid recipient.   APF4Y billed the Medicaid Program for a powered air flotation bed, cough stimulating device, and knee/ankle/foot orthotic and was paid more than $16,000 for these products.   APF4Y did not bill any of these products to Medicare.

43.     APF4Y also billed DME products to the Medicaid Program for Medicaid recipients as if they were dually eligible when they were not.   For example, APF4Y billed the Medicaid Program for a cough stimulating device, knee/ankle/foot orthotic, and osteogenesis stimulator for "L.G.".   APF4Y noted in their claim submissions that L.G. had Medicare and Medicaid coverage and that it had submitted these claims to Medicare.   L.G. was born in 1974 and has never been a Medicare recipient.   The Medicaid Program paid APF4Y more than $16,000 for these three products.

44.     The Medicaid claims billing system assumes that the Provider has followed Medicare's prior approval process, if applicable, when a patient is Medicare/Medicaid eligible.   As a result, the Medicaid billing system does not verify that the Provider has obtained prior approval for DME products billed for dually eligible recipients.   APF4Y did not have prior approval from the Medicaid Program to bill a cough stimulating device, knee/ankle/foot orthotic, and osteogenesis stimulator for L.G.   Because APF4Y told the Medicaid Program that L.G. was

12

dually eligible, the Medicaid Program paid the claim without verifying that APF4Y obtained the approvals that would have been necessary if the recipient was identified as a Medicaid-only recipient.

Reverse False Claims

45.     APF4Y knew by December, 2016, that it owed at least $12,000,000 to the Medicaid Program for billing DME products in violation of the Medicaid policy.

46.     APF4Y was required to maintain all medical necessity, prior approval, and order/delivery documentation.  If APF4Y is unable to show that the DME product it delivered was medically necessary, the Medicaid Program can recoup monies it paid for said product.   If APF4Y is unable to show that it obtained prior approval prior to billing the claim that required said approval, or that the product was actually ordered for and/or delivered to the Medicaid recipient, the Medicaid Program can recoup monies it paid for the product.

47.     APF4Y is required to return all monies it was paid for products it billed to the Program in violation of the Medicaid policy.   Failure to provide said payments within a reasonable time of notice of overpayment is a reverse false claim.

48.     APF4Y is required to return all monies it was paid for products it may have billed appropriately, or thought that it billed appropriately, but later determined that it did not have the necessary documentation to support the prior billings.  When APF4Y became aware that it was unable to support its prior billings, regardless of whether the product was initially billed correctly, APF4Y was obligated to repay the Program.   Its failure to do so more than a year after identifying the overpayment is a reverse false claim.

Knowledge

49.     APF4Y had actual knowledge that it did not submit dually eligible claims to Medicare for payment before it billed the same claims to the Medicaid Program.   Further, APF4Y

knew that it had not obtained prior approval for these products nor did it have the required medical necessity documents to support the claims billed. APF4Y knew that it did not purchase these products from manufacturers or wholesalers and therefore it could not supply these same products to its patients. APF4Y knew that it billed the Medicaid Program, and was paid, more than $9,000,000 for DME products that it never provided to Medicaid recipients.

50.     APF4Y admitted in the Business Court Action that it billed the Medicaid Program for more than $9,000,000 of products that it did not have the necessary documentation to support.

51.     Gibson owned the company, in whole or in part, and submitted its healthcare billings. Gibson accessed the Medicaid electronic claims submission website routinely, controlled the finances of the company, and paid the bills submitted by vendors and manufacturers for product they supplied to APF4Y. Gibson knows that she did not approve APF4Y's purchase of any Powered Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices. Gibson knew that the company tripled its profit in a very short time without a corresponding increase in product purchased by the company to account for their substantial profits. Gibson acted with actual knowledge, reckless disregard or deliberate ignorance of the falsity of APF4Y's Medicaid claims submissions for product APF4Y never provided to its patients.

52.     Bandy was APF4Y's primary salesperson and DME fitter before she filed the Business Court Action alleging partial ownership of the company. Bandy submitted some or all of APF4Y's Medicaid claims for Powered Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, and Cough Stimulating Devices. Bandy also submitted the Medicaid claims submissions for dually eligible patients without obtaining the necessary prior approvals or billing the Medicare program for the claims. Bandy acted with actual knowledge, reckless disregard or deliberate ignorance of the falsity of APF4Y's

14

Medicaid claims submissions for products APF4Y never provided to its Medicaid patients.

53.     Gibson and Bandy directly and indirectly profited from APF4Y's false claim submissions to the Medicaid Program.

<u>Materiality</u>

54.     The Medicaid Program would not have paid over $9,000,000 for Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices if it had known that these products were never delivered to Medicaid recipients.

55.     The Medicaid Program would not have paid over $9,000,000 for Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices if it had known that Defendants submitted these claims to Medicaid for dually eligible patients without submitting them first to the Medicare Program for payment.

56.     The Medicaid Program would not have paid over $9,000,000 for Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices if it had known that Defendants failed to obtain the necessary prior approvals before billing these products.

57.     The Medicaid Program would not have paid over $9,000,000 for Air Flotation Beds, Bone Growth Stimulators, Power Wheelchair Accessories, Custom Knee/Ankle/Foot Orthotics, or Cough Stimulating Devices if it had known that Defendants failed to obtain and retain medical necessity documentation and delivery confirmation for these products.

<u>Money Movement</u>

58.     Gibson transferred more than $7,800,000 out of the company for her own personal use, including close to $600,000 for the purchase of a lake property; $150,000 to a construction

15

company owned by her and her husband; $2,100,000 for annuities, life insurance and certificates of deposit in her and her husband's name; over $1,400,000 in wages, salary, bonuses and other compensation to herself and her husband; and over $200,000 in vehicles.

59. Gibson transferred at least $375,000 from the company to Bandy in wages and other compensation, including the purchase of a home. Bandy was paid a bi-weekly salary and a percentage of the revenue generated from products she sold on behalf of the company, including all of the Medicaid claims she submitted for APF4Y patients. As an example, on October 28, 2015, APF4Y paid Bandy a commission of $165,900. Gibson directed and approved these payments to Bandy.

## FIRST CAUSE OF ACTION
### False Claims Act: Submission of False Claims

60. Plaintiffs re-allege and incorporate by reference the paragraphs above as if set forth fully herein.

61. By virtue of the acts described above, Defendants APF4Y, Gibson and Bandy knowingly presented or caused to be presented to the Medicaid Program through Defendant APF4Y false or fraudulent Medicaid claims for payment in violation of the False Claims Act, as amended, 31 U.S.C. § 3729 (a)(1)(A); in that the products for which Defendant APF4Y claimed Medicaid reimbursment were not provided, not provided as billed, or otherwise did not qualify for reimbursement under the Medicaid program.

62. By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### False Claims Act: False Statements to Get a Claim Paid

63. Plaintiffs reallege and incorporate by reference the paragraphs above as if set forth fully herein.

64. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent Medicaid claim in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(B), in that the products for which Defendant APF4Y claimed Medicaid reimbursment were not provided, not provided as billed, or otherwise did not qualify for reimbursement under the Medicaid program.

65. By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION**
**False Claims Act: Reverse False Claim**

66. Plaintiffs reallege and incorporate by reference the paragraphs above as if set forth fully herein.

67. By virtue of the acts described above, Defendants know that APF4Y lacks the necessary, material documentation in its files to support Medicaid payments it accepted in violation of the False Claims Act, as amended, 31 U.S.C. § 3729(a)(1)(G). Defendants have known about their obligation to repay the Medicaid Program for more than a year, but have avoided repaying these claims back to the Governments.

68. By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
**N.C. False Claims Act: Submission of False Claims**

69. Plaintiffs re-allege and incorporate by reference the paragraphs above as if set forth fully herein.

70. By virtue of the acts described above, Defendants knowingly presented or caused to be presented to the Medicaid Program through Defendant APF4Y false or fraudulent Medicaid claims for payment in violation of the North Carolina False Claims Act N.C. Gen. Stat. § 1-

17

607(a)(1) in that the services for which Defendant APF4Y claimed Medicaid reimbursment were not provided, not provided as billed, or otherwise did not qualify for reimbursement under the Medicaid program.

71.     By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### N.C. False Claims Act: False Statements to Get a Claim Paid

72.     Plaintiffs reallege and incorporate by reference the paragraphs above as if set forth fully herein.

73.     By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, a false record or statement material to a false or fraudulent Medicaid claim in violation of the North Carolina False Claims Act N.C. Gen. Stat. § 1-607(a)(2) in that the medical products for which Defendant APF4Y claimed Medicaid reimbursment were not provided, not provided as billed, or otherwise did not qualify for reimbursement under the Medicaid program.

74.     By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### N.C. False Claims Act: Reverse False Claim

75.     Plaintiffs reallege and incorporate by reference the paragraphs above as if set forth fully herein.

76.     By virtue of the acts described above, Defendants know that APF4Y lacks the necessary, material documentation in its files to support Medicaid payments it accepted in violation of the North Carolina False Claims Act, N.C. Gen. Stat. § 1-607(a)(2).   Defendants have known about their obligation to repay the Medicaid Program for more than a year, but have avoided

18

repaying these claims back to the Governments.

77.     By reason of the foregoing, Plaintiffs suffered actual damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
**Common Law Fraud**

78.     Plaintiffs re-allege and incorporate by reference the paragraphs above as if set forth fully herein.

79.     This is a claim against Defendants under common law fraud.

80.     The above described false claims and false statements which Defendants knowingly presented or caused to be presented to the Medicaid Program, or knowingly made or caused to be made or used in support of a claim to the Medicaid Program, which are (1) false representations or concealments of material facts, (2) reasonably calculated to deceive the Medicaid Program, (3) made with intent to deceive the Medicaid Program, (4) which did in fact deceive the Medicaid Program, and (5) resulted in damage to the Medicaid Program. Based on APF4Y's executed Provider Agreement, the Medicaid Program reasonably relied on APF4Y's certification that it would file appropriate, non-deceptive, claims for reimbursement.   As a result of the false claims, the Medicaid Program reimbursed APF4Y for products that were never provided, not provided as billed, or billed in violation of Medicaid policy, which the Medicaid Program would not have paid had APF4Y not filed false and deceptive claims.

81.     Plaintiffs, acting on the accuracy and truthfulness of the information contained in the claims submitted, paid certain sums of money to which it was not entitled, and Defendants are thus liable to account for and pay such amounts, which are to be determined at trial, to the United States and the State of North Carolina.

## EIGHTH CAUSE OF ACTION
### Payment under Mistake of Fact/Restitution

82.     Plaintiffs re-allege and incorporate by reference the paragraphs above as if set forth fully herein.

83.     This is a claim against Defendants under mistake of fact.

84.     The above described false claims and false statements which Defendants submitted or caused to be to Plaintiffs constituted misrepresentations of material fact in that they misrepresented the products they provided to Medicaid recipients.

85.     Plaintiffs, acting on the accuracy and truthfulness of the information contained in the claims submitted, paid certain sums of money to which it was not entitled, and Defendants are thus liable to account for and pay such amounts, which are to be determined at trial, to the United States and the State of North Carolina.

## NINTH CAUSE OF ACTION
### Unjust Enrichment/Restitution

86.     Plaintiffs re-allege and incorporate by reference the paragraphs above as if fully set forth herein.

87.     This is a claim for recovery of monies by which Defendants have been unjustly enriched.

88.     By virtue of the false claims and false statements described above, Defendants wrongfully obtained Medicaid funds to which they were not entitled.

89.     By directly or indirectly obtaining Medicaid funds to which they was not entitled, Defendants were unjustly enriched at the expense of Plaintiffs, and are liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States and the State of North Carolina.

20

## PRAYER

WHEREFORE, Plaintiffs request that the Court enter judgment in favor of the United States and the State of North Carolina and against the Defendants as follows:

1.   On the First, Second, Third, Fourth, Fifth and Sixth Causes of Action, under the False Claims Acts, a judgment against Defendants, jointly and severally, for the amount of damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.   On the Seventh and Eighth Causes of Action, a judgment against Defendants, jointly and severally, for payment by mistake of fact and unjust enrichment, for the damages sustained and/or amount which Defendant received which were in error or by which Defendant were unjustly enriched, together with costs and interest.

3.   On the Ninth Cause of Action, for common law fraud, a judgment against Defendants, jointly and severally, in an amount to be determined, together with costs and interest.

4        For such other and further relief as this Court deems just and proper.

Respectfully submitted this 13th day of December, 2017.

ROBERT J. HIGDON, JR.
United States Attorney

By:     /s/ Joshua B. Royster
        JOSHUA B. ROYSTER
Assistant United States Attorney
310 New Bern Avenue
Suite 800 Federal Building
Raleigh, North Carolina 27601
Telephone:   (919) 856- 4530
Facsimile:   (919) 856-4821
E-mail: joshua.royster@usdoj.gov
N.C. Bar # 28785

21

JOSH STEIN
NC Attorney General

By:      /s/ F. Edward Kirby, Jr.
              F. EDWARD KIRBY, JR.
Special Asst. United States Attorney
Special Deputy Attorney General
N.C. Bar # 23223
FKirby@ncdoj.gov
5505 Creedmoor Road, Suite 300
Raleigh, North Carolina 27612
Telephone:   (919) 881-2320
Facsimile:   (919) 571-4837

/s/ Stacy M. Race
STACY M. RACE
Special Asst. United States Attorney
Special Deputy Attorney General
N.C. Bar # 31743
SRace@ncdoj.gov
5505 Creedmoor Road, Suite 300
Raleigh, North Carolina 27612
Telephone:   (919) 881-2320
Facsimile:   (919) 571-4837